**Affirmed in part; Reversed in part and Opinion Filed August 12, 2021**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

## No. 05-19-01264-CV

**MACY'S RETAIL HOLDINGS, INC., Appellant**
**V.**
**AUDON BENAVIDES, Appellee**

**On Appeal from the 134th Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. DC-18-10796**

## MEMORANDUM OPINION

Before Justices Osborne, Pedersen, III, and Nowell
Opinion by Justice Nowell

Audon Benavides sued Macy's Retail Holdings, Inc. for retaliating against him for participating in a disability discrimination case filed by another employee. Following a bench trial, the trial court found in Benavides's favor and awarded damages. Macy's appeals the adverse judgment, argues the evidence is legally and factually insufficient to establish retaliation or to support the damages awarded, and asserts the trial court abused its discretion by excluding evidence at trial. We reverse the trial court's judgment in part and affirm in part.

FACTUAL BACKGROUND

Benavides worked for Macy's as a part-time Asset Protection Detective in the Irving Mall store in Irving, Texas. During his employment, he was named Macy's employee of the month on numerous occasions and received back-to-back employee of the year awards. Benavides's employment with Macy's ended in May 2017, but the parties disagree about the reason Benavides stopped working for Macy's.

## A.  Macy's Terminated Benavides's Supervisor

Joe Alviar, a Macy's Asset Protection Manager at Irving Mall, was Benavides's supervisor until he was terminated in August 2015. Benavides described Alviar's work as "[o]utstanding in comparison to others" and testified the store performed well when Alviar was the Asset Protection Manager. Alviar reported to John Lillard, the district manager.

On August 8, 2015, Lillard met with Benavides and two other asset management employees and inquired about Alviar's leadership and job performance. Benavides reported he thought Alviar was a good leader, Alviar maintained a "great department, he produced positive results, and "the morale was outstanding." Shortly after this conversation, Alviar was terminated. Alviar filed a complaint with the Texas Workforce Commission (TWC) on September 17, 2015.

On October 9, 2015, Benavides sent an email to Alviar. The email is in the form of a letter. Benavides addressed the email to "To Whom It May Concern," and

stated he wrote on Alviar's behalf "regarding a civil matter between" Alviar and Macy's. The letter states:[1]

> It was recently brought to my attention by Mr. Alviar of his intentions to address the discharge of his employment by Macy's INC in which unofficial and false statements may have been fabricated and submitted by Mr. Alviar's former direct supervisor, Mr. John Lillard, an individual, titled as District Director of Asset Protection employed by Macy's INC. It is to my understanding that Mr. Lillard may have submitted false information to the Texas Workforce Commission, a State Government Agency which is investigating a formal complaint filed by Mr. Alviar against Macy's INC, which three (3) direct employees names of Mr. Alviar were used in falsifying state government records.

In his letter, Benavides recounted his August 8, 2015 meeting with Lillard when he told Lillard about Alviar's excellent job performance. Benavides provided the letter to Alviar with the understanding that Alviar would use the letter as part of his complaint to the TWC.

Lillard and Margarita Pena Tidwell, a human resources manager for Macy's, attended Alviar's TWC hearing telephonically and were provided with some documents, including Benavides's email letter. Benavides testified that before October 2015, he had a positive, professional, and respectful working relationship with Lillard. However, after Benavides provided the October 2015 email letter to Alviar, Lillard's demeanor changed; Lillard became nonresponsive and

---

[1] Errors in original text.

unprofessional, he nearly stopped communicating with Benavides, and he avoided Benavides in the store.

On May 18, 2016, Alviar sued Macy's and Lillard, individually, for violating section 21.051 of the Texas Labor Code. Alviar's original petition alleged he served in the United States Army and served three deployments in Iraq and Afghanistan before he was diagnosed with and treated for Post-Traumatic Stress Disorder (PTSD) by the Veteran's Administration. Alviar alleged he was subject to discrimination by Lillard, "who expressed hostility to [Alviar's] PTSD condition," and he was terminated because of his disability or because he was regarded as having a disability. When Alviar served his responses to requests for disclosures on September 23, 2016, he listed Benavides as a person with relevant knowledge. Benavides did not have actual knowledge about whether Lillard or other Macy's employees saw the disclosures.

On February 28, 2017, Benavides was deposed in the Alviar litigation.

### B.    Benavides's New Supervisor

After Macy's terminated Alviar in 2015, Javier Ibarra became the Asset Protection Manager and Benavides's supervisor. On May 24, 2016, Ibarra pursued a suspected shoplifter in a manner that violated Macy's Asset Protection Procedures. While reviewing the store's closed circuit television (CCTV) footage a couple days later, Benavides saw Ibarra's Pursuit Policy violation (Benavides was not working on the day of the incident). Benavides promptly reported the violation to Lillard,

–4–

and Lillard instructed Benavides to record the CCTV footage with his cell phone because Lillard was concerned Ibarra would delete the video. Benavides testified Lillard "instructed me to record it, videotape it by any means necessary, and he did mention use your cell phone if you have to in order to save the video footage." Benavides recorded the CCTV footage with his cell phone.[2]

## C. Harassment Allegation

The next month, in June 2016, Margarita Pena Tidwell, a human resources manager for Macy's, informed Benavides that she was investigating a sexual harassment claim against him. Benavides denied the allegation and was suspicious the report was fake because he was permitted to return to work after his meeting with Tidwell; if there had been an official claim of harassment, Benavides believed he should have been suspended pending the investigation to maintain a safe working environment. Further, during the two weeks after his meeting with Tidwell, Benavides was assigned to work at the same times as the complaining employee.

Ultimately, following an investigation, no disciplinary action was taken against Benavides. Tidwell testified she was not able to reach any conclusions about whether Benavides sexually harassed the other employee, but she also did not find evidence the complaining employee was "put up to" filing the complaint against

---

[2] Macy's Asset Protection Procedures state in part: "Under no circumstances should any member of Asset Protection save CCTV video footage to a personal device, such as a SMART phone. Sharing video with others, who do not have a business need to know, is strictly prohibited." The procedure states that violations of the policy will result in disciplinary action up to and including termination.

Benavides.  Benavides believed the sexual harassment allegation was fabricated as part of Macy's retaliation for his participation in Alviar's suit against the company.

### D.    Benavides's Complaints and Macy's Investigation

On July 11, 2016, Benavides submitted a three-page, single-spaced letter to Macy's raising his concerns about the following topics (as described in his letter):

*Falsifying Company Documents/Records by District Management using employees [sic] names.
*Retaliation by District Manager and Immediate Department Manager.
*Company Violation by Department Manager.
*Unfair treatment acts.
*Confidential Personal Information exposed to public.
*Hostile Work Environment created by Management.

The first sentence of the letter states Benavides has been "experiencing difficulty and unfair treatment" by Ibarra and Lillard.  He then recounts events beginning in August 2015 when Alviar was terminated.

The July 11 letter describes the October 2015 email letter Benavides provided on Alviar's behalf and states Lillard and Tidwell attended Alviar's TWC hearing at which time they learned about Benavides's October 2015 email letter. "Shortly thereafter in the coming months, I started to experience difficulty with my schedule by Mr. Ibarra which I never had any difficulties with before."  His scheduling difficulties continued into April 2016.  The letter states: "Management has always been aware of my primary employer's changing schedule and always assisted me with my schedule.  However, after I provided my statement to the Texas Workforce

–6–

Commission, management would no longer work with my schedule." Benavides further explains his belief that Ibarra treats him differently from other employees.

The July 11 letter also describes Ibarra's Pursuit Policy violation that occurred approximately six weeks earlier and how Benavides obtained video footage of the incident.

Kim Bass, Macy's regional director of associate relations, was assigned to investigate Benavides's allegations. Benavides testified he had several conversations with Bass, and he told her that Lillard instructed him to record the CCTV footage showing Ibarra violating the Pursuit Policy with his cell phone. On October 12, 2016, Bass asked Benavides to send a copy of the video to her.

In a November 14, 2016 email, Benavides told Bass he continued experiencing hostility from Ibarra and complained Ibarra "refused to work with my schedule since speaking on behalf of a wrongful termination incident when my name was used without my knowledge on falsified company and state government documents by Mr. John Lillard." He stated his only option was to move to a "flex position," which required he work a minimum number of hours; however, Ibarra only offered work hours on days and at times when Benavides was unavailable. Ibarra's response to Benavides concerns was that Ibarra makes the schedule "any way he pleases." Benavides stated this was more evidence of retaliation.

On February 1, 2017, Bass informed Benavides that she investigated his allegations against Lillard, Tidwell, Ibarra, and Debbie Atkins, District Director of

Human Resources, but she concluded the individuals' actions were in accordance with company policy. "As a result your claim and request for remedy has been denied."

Macy's documents show Benavides told Tidwell on February 6, 2017, about the CCTV video. Upon review of that video, Tidwell realized Ibarra violated company policy and commenced an investigation. During that investigation, Macy's determined Benavides violated two policies: (1) he downloaded information to his personal device without permission and (2) he failed to share the information in a timely manner.

On February 7, 2017, Tidwell discussed Benavides's concerns with Vicki Lasker, then the director of associate relations; she told Lasker that Benavides had written letters about Alviar's suit against Macy's. At the time Tidwell spoke to Lasker, Tidwell knew that Benavides would be deposed in the Alviar litigation later in the month. Lasker's notes from the conversation reflect that they discussed Alviar suing Macy's. Lasker's notes from that conversation also indicate Benavides wanted Macy's to change his schedule to accommodate his primary employment, but the requested scheduling change did not fit Macy's business needs.

On the same day, Lasker was contacted by Denise Sibrian, the asset protection department's training manager. Lasker's notes from the conversation include:

> Joe Alviar – Irving
> Termed 2015
> . . .

> Told HR PTSD, still termed.
> Fought term and in litigation now.
> Detective there at time was main culprit and is a FT sherrifs [sic]. Don Benavides
> . . .
> Don is testifying for Joe.

Her notes state that since Alviar left, Benavides filed complaints; Benavides showed a video of Ibarra's policy violation; and Benavides "has video on personal device. Aware of violation and didn't report it." Lasker testified Macy's learned about Ibarra's policy violation when Benavides brought forth his video on his personal device. In a February 15, 2017 email, Lasker was told to terminate Ibarra for the Pursuit Policy violation and place Benavides and another asset protection employee on a Decision Making Leave, a procedure discussed further below.[3]

On March 11, 2017, Tidwell met with Benavides to discuss the outcome of her investigation into his retaliation concerns. Tidwell investigated Benavides's allegation that he timely notified Lillard about Ibarra's policy violation, but she concluded Benavides did not discuss the policy violation with Lillard. Further, Tidwell concluded Ibarra's policy violation occurred in May, but Benavides did not report it to anyone until July even though he was required to report the incident immediately. Tidwell testified that Benavides did not tell her that Lillard had instructed him to copy the video. Tidwell told Benavides she did not find evidence of retaliation. In the March 11 meeting, Tidwell presented Benavides with a

---

[3] Ibarra was terminated on or about February 15, 2017, for violating the Pursuit Policy.

Decision Making Leave, which is part of Macy's Responsibility Based Performance Policy.

### E.    Macy's Responsibility Based Performance Policy

Macy's maintains a Responsibility Based Performance (RBP) policy for employees whose performance or conduct falls below expectations. The policy outlines a four-step process and states that, depending on the severity or timing of the conduct, some or all of the steps may be undertaken. The final step is a Decision Making Leave (DML), which the policy explains:

> If your performance and/or conduct does not meet expectations . . . [y]ou may be given a Decision Making Leave (with pay, no more than 1 shift) to think about and decide whether or not you want to continue your employment with Macy's.
>
> Your choices may include:
>
> o *You want to continue working at Macy's.* In this case, you will need to agree that it is your responsibility to meet expectations and commit to sustained improvement. You will need to write an action plan detailing the steps you will take to improve on a Decision Making Leave Form.
> If after making this commitment your performance and/or conduct does not meet Macy's expectations, it may result in immediate termination.
>
> o *You may choose to resign from Macy's.*

The DML pre-printed form states that if the employee does not choose one of these two options, then Macy's "will determine that you have chosen to resign from Macy's."

–10–

Benavides refused to sign the DML or provide an action plan. Rather, he told Tidwell that he had timely informed Bass and Lillard about Ibarra's policy violations and the DML was unwarranted.

Benavides emailed Bass on March 13, 2017, stating that he received a DML after he followed Bass's advice and provided video evidence of Ibarra's policy violation to Tidwell. He noted this was the "same evidence I listed in my initial claim . . . in July 2016." His email also states the policy violation by Ibarra occurred on May 24, 2016, and was reported to Lillard a few days later when Benavides became aware of it. In an April 8, 2017 email to Bass, Benavides again reiterated the history of his concerns, including retaliation by Ibarra, and again stated he reported Ibarra's policy violation to Lillard immediately and Lillard instructed him to "make a copy of the [CCTV] footage by any means in the event the DVR would be tampered with."

In a letter to Benavides dated April 4, 2017, Tidwell wrote she found no evidence of retaliation, and Macy's decided to place Benavides on a DML for failing to timely report Ibarra's policy violation and for copying "Macy's proprietary video to your personal device without management approval, or partnership in violation of company policy." At trial, Tidwell testified Benavides was not given the DML because he was identified as or served as a witness in Alviar's lawsuit, and he was not given the DML because he made complaints. Tidwell testified Benavides had a choice about whether to continue his employment with Macy's, but he chose not to

–11–

complete an action plan. Benavides was not fired; he voluntarily resigned. Benavides made the decision to terminate his employment.

In emails from May 2017, Lasker reiterated that Benavides could complete an action plan and return to work or choose not to, which Macy's would consider a voluntary resignation; Lasker eventually stated Macy's was accepting Benavides's refusal to complete an action plan as his resignation. Lasker testified she never told Benavides he would be fired. Rather, if Benavides had completed an action plan, he could have continued his employment.

Documents from Macy's show Benavides was terminated. Notes from Lasker state: "If I do not hear from him, we will assume he is not writing an action plan and we will close his file terminating his employment." Lasker described it as a voluntarily termination.

Lasker maintained that Benavides testifying for and supporting Alviar had nothing to do with the issuance of the DML. Benavides was not given a DML because he was serving as a witness in Alviar's lawsuit, he was identified as a witness in the lawsuit, or he provided Alviar with the July 11, 2015 email letter. However, Benavides testified Lasker told him he would be terminated if he did not accept the disciplinary action. He also testified that, based on the DML, he understood he needed to provide an action plan to avoid a perceived voluntarily resignation.

Benavides testified at trial that the DML was unwarranted. He did not record the CCTV footage showing Ibarra's policy violation on his cell phone for personal use, but did so at Lillard's instruction. Benavides agreed that if he had failed to report the information or had copied Macy's proprietary video on his personal device without approval, then he would have been in violation of Macy's policies.

The last day Benavides worked for Macy's was September 13, 2016. He was paid for three hours of work on March 11, 2017, which was the day he received the DML. Benavides's employment was terminated on May 5, 2017.

LAW & ANALYSIS

Macy's raises numerous arguments about the legal and factual sufficiency of the evidence. Following the bench trial, the trial court entered findings of fact and conclusions of law. Findings of fact in a nonjury trial have the same weight as a jury's verdict and are reviewed under the same standards that are applied in reviewing evidence to support a jury's verdict. *See Catalina v. Blasdel*, 881 S.W.2d 295, 297 (Tex. 1994). When evaluating the legal sufficiency of the evidence to support a finding, we credit favorable evidence if a reasonable factfinder could and disregard contrary evidence unless a reasonable factfinder could not. *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005). The ultimate test is whether the evidence allows reasonable minds to reach the finding under review. *See id*. Anything more than a scintilla of evidence is legally sufficient to support a challenged finding. *Catalina*, 881 S.W.2d at 297. When reviewing the factual

–13–

sufficiency of evidence, we review all the evidence in support of and against the trial court's finding and will set aside the finding only if the evidence is so weak or if the finding is so against the great weight and preponderance of the evidence that it is clearly wrong and unjust. *See Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 242 (Tex. 2001); *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986) (per curiam). In a bench trial, the trial court is the sole judge of the credibility of the witnesses and may believe one witness over another and resolve any conflicts or inconsistencies in the testimony. *Shaw v. Cty. of Dallas*, 251 S.W.3d 165, 169 (Tex. App.—Dallas 2008, pet. denied). A party appealing from a nonjury trial in which the trial court made findings of fact and conclusions of law should direct an attack on the sufficiency of the evidence at specific findings of facts, rather than the judgment as a whole. *Id.*

### A. Evidence of Retaliation

Benavides sued Macy's for violating section 21.055 of the Texas Labor Code, alleging Macy's retaliated against him for providing a statement and deposition testimony in support of Alviar's claim of disability discrimination. Because retaliatory intent is rarely overt, the tripartite *McDonnell Douglas* burden-shifting framework provides a mechanism to support a retaliation claim with circumstantial evidence. *Alamo Heights Indep. Sch. Dist. v. Clark*, 544 S.W.3d 755, 764 (Tex. 2018) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)). To establish a prima facie case of retaliation, the plaintiff must show (1) he engaged in a protected activity, (2) an adverse employment action occurred, and (3) a causal

–14–

link existed between the protected activity and the adverse action. *Tex. Dep't of Transp. v. Lara*, No. 19-0658, 2021 WL 2603689, at *8 (Tex. June 25, 2021). Protected activities consist of (1) opposing a discriminatory practice; (2) making or filing a charge; (3) filing a complaint; or (4) testifying, assisting, or participating in an investigation, proceeding, or hearing. *See* TEX. LAB. CODE § 21.055; *San Antonio Water Sys. v. Nicholas*, 461 S.W.3d 131, 137 (Tex. 2015); *Gonzalez v. Champion Techs., Inc.*, 384 S.W.3d 462, 466 (Tex. App.—Houston [14th Dist.] 2012, no pet.). If the plaintiff meets this requirement, the burden then shifts to the defendant to demonstrate a legitimate nondiscriminatory purpose for the adverse employment action. *Gonzalez*, 384 S.W.3d. at 466. The plaintiff then assumes the burden to present proof that the stated reason was pretextual. *Id.* A retaliation claim "focuses on the employer's response to an employee's protected activity." *City of Dallas v. Nkansah*, No. 05-18-00069-CV, 2018 WL 6599025, at *2 (Tex. App.—Dallas Dec. 17, 2018, pet. denied) (mem. op.) (citing *Alamo Heights*, 544 S.W.3d at 763-64). The statute does not protect an employee from all forms of discipline or even termination, but a remedy exists when the evidence establishes that a materially adverse employment action resulted from the employee's protected activities. *Alamo Heights*, 544 S.W.3d at 764.

In its first issue, Macy's argues the evidence is legally and factually insufficient to support the trial court's retaliation finding because the evidence does not establish (1) Benavides engaged in a protected activity; (2) termination of

–15–

Benavides's employment was an adverse employment action by Macy's; and (3) but-for causation.

### 1. Protected Activity

Macy's argues the evidence is legally and factually insufficient to establish Benavides engaged in a protected activity by opposing discrimination. Macy's expressly acknowledges the trial court based its judgment on two separate alleged protected activities, which are described in Conclusions of Law 1 and 2. Conclusion of Law 1 states Macy's terminated Benavides for participating in a proceeding brought by Alviar for disability discrimination under Chapter 21 of the Texas Labor Code. Conclusion of Law 2 states Macy's terminated Benavides for opposing illegal discrimination under Chapter 21. Macy's challenges Conclusion of Law 2.[4]

An appellant must attack all independent bases or grounds that fully support a complained of ruling or judgment. *Stern v. Bella Custom Homes, Inc.*, No. 05-17-01114-CV, 2019 WL 3543574, at *3 (Tex. App.—Dallas Aug. 5, 2019, no pet.) (mem. op.) (citing *Blackstone Med., Inc. v. Phoenix Surgicals, L.L.C.*, 470 S.W.3d 636, 648 (Tex. App.—Dallas 2015, no pet.)). If an independent ground fully supports the complained-of ruling or judgment, but the appellant assigns no error to that independent ground, an appellate court must accept the validity of that

---

[4] Macy's brief states that "[w]ith regard to COL 1, Macy's does not dispute that Benavides's designation as a witness in Alviar's lawsuit constituted a protected activity."

unchallenged independent ground, and any errors in the grounds challenged on appeal are harmless. *Id.* (citing *Blackstone Med.*, 470 S.W.3d at 648).

We agree with Macy's that Benavides's acts of testifying, assisting, or participating in Alviar's TWC proceeding and Alviar's lawsuit are an independent basis that fully support the trial court's conclusion that Benavides engaged in a protected activity. Because Macy's failed to challenge this basis—rather Macy's agrees that it is an independent basis for the trial court's judgment—we must accept the validity of the independent ground, and any error by the trial court in concluding that Benavides opposed illegal discrimination is harmless.

However, because Macy's challenges Conclusion of Law 1 in its argument that the evidence is insufficient to establish that Benavides's termination was an adverse employment action by Macy's, which is discussed further below, we will consider whether the facts support Conclusion of Law 1 insofar as it states Benavides participated in a proceeding brought by Alviar for disability discrimination. It is uncontested that Benavides provided an email letter to Alviar for Alviar to use in his TWC proceeding, Alviar used the email letter in his TWC proceedings, and Lillard and Tidwell were aware of Benavides's letter email. Alviar subsequently designated Benavides as a person with relevant knowledge in his disclosures after filing a lawsuit against Macy's, and, on February 28, 2017, Benavides was deposed as part of the lawsuit between Alviar and Macy's. Having reviewed the record, we conclude

–17–

the facts support the trial court's conclusion that Benavides engaged in a protected activity.

## 2. *Adverse Employment Action*

Macy's argues the evidence is legally and factually insufficient to establish the termination of Benavides's employment was an adverse employment action by Macy's. Macy's specifically challenges the trial court's Findings of Fact 25,[5] 26,[6] and 32[7] and Conclusions of Law 1[8] and 2.[9] Macy's argues the evidence conclusively establishes that Benavides's refusal to provide a written action plan in response to the DML constituted a voluntary resignation, and Macy's did not fire him.

Macy's records show Macy's considered Benavides's employment to be "terminated." Lasker's notes state that if Benavides did not complete an action plan, then "we will close his file terminating his employment." However, Lasker's emails show she told Benavides he could complete an action plan and return to work and, if he did not, it would be considered a voluntarily resignation. But an email dated May 5, 2017 from Lasker to other Macy's employees instructs them to "process his

---

[5] On May 5, 2017[,] Defendant terminated Plaintiff.

[6] Defendant's Director of Associate Relations Vicki Lasker investigated Plaintiff and made the decision to terminate Plaintiff.

[7] However, Defendant's paperwork indicates Plaintiff was terminated.

[8] Defendant Macy's Retail Holdings, Inc. terminated Plaintiff for participating in a proceeding brought by Joe Alviar for disability discrimination brought under Chapter 21 of the Texas Labor Code.

[9] Defendant Macy's Retail Holdings, Inc. terminated Plaintiff for opposing illegal discrimination under Chapter 21 of the Texas Labor Code.

termination . . . effective 5/5/17." She testified: "His employment terminated because his employment ended." Other documents from Macy's also show Benavides was "terminated." We conclude the evidence is legally and factually sufficient to support the trial court's Finding of Fact 25 that Macy's terminated Benavides on May 5, 2017; Finding of Fact 26 that Lasker made the decision to terminate him; and Finding of Fact 32 that Macy's paperwork indicates Benavides was terminated.

The next question is whether the termination of Benavides was an adverse employment action. The Texas Labor Code does not protect employees from all retaliatory employment action, only from actions that are "materially adverse." *Alamo Heights*, 544 S.W.3d at 788. Materially adverse "means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id.* This objective materiality requirement separates significant from trivial harms. *Id.* "An employee's decision to report discriminatory behavior cannot immunize that employee from those petty slights or minor annoyances that often take place at work and that all employees experience." *Id.* "Termination is unquestionably a materially adverse employment action." *Id.* at 788–89.

Macy's maintains Benavides received the DML for failure to timely report Ibarra's Pursuit Policy violation and for having the CCTV footage on his cell phone. However, Benavides maintained the DML was unwarranted because he timely informed Lillard about Ibarra's policy violation, and Lillard instructed him to record

–19–

the CCTV footage. The trial court heard conflicting evidence and, as the finder of fact, was free to accept Benavides's recitation of events and reject Lillard's. The trial court found Benavides's rendition of events to be credible and could then conclude the DML was unwarranted—as Benavides maintained.

Upon receiving the DML, Benavides was faced with the draconian choice of agreeing he had a responsibility to meet expectations (inferring he had not been doing so), committing to sustained improvement (inferring he needed to improve), and providing a written action plan or ending his employment with Macy's. The options in the DML, when made in response to a protected activity, are not slight or minor annoyances, but are significant harms that would dissuade a reasonable worker from engaging in a protected activity. Because Benavides refused to take the first option, which would have forced him to effectively acknowledge wrongdoing that the trial court did not believe occurred, Macy's terminated his employment.

We conclude there is more than a scintilla of evidence showing Benavides suffered an adverse employment action, and the evidence is not so weak as to be clearly wrong or unjust.

### 3. Causal Link Between Protected Activity and Adverse Action

Macy's argues the evidence is legally and factually insufficient to establish but-for causation between Benavides's protected activity and the termination of his employment. Recently, in *Apache Corporation v. Davis,* the Texas Supreme Court

reiterated that the standard of causation "should be that the employee's protected conduct must be such that, without it, the employer's prohibited conduct would not have occurred when it did." *Apache Corp. v. Davis*, No. 19-0410, 2021 WL 2603824, at *9 (Tex. June 25, 2021) (quoting *Texas Department of Human Services v. Hinds*, 904 S.W.2d 629, 636 (Tex. 1995)). In *Hinds*, the court "reasoned that this would not have occurred when it did standard 'best protects employees from unlawful retaliation without punishing employers for legitimately sanctioning misconduct or harboring bad motives never acted upon,' though we added that an employee is not required 'to prove that his reporting illegal conduct was the sole reason for his employer's adverse actions.'" *Id.* (quoting *Hinds*, 904 S.W.2d at 636). The but-for causation standard applies in cases alleging retaliation for opposing discriminatory practices under Section 21.055. *Id.* (citing *Alamo Heights*, 544 S.W.3d at 782).

In *Alamo Heights*, the supreme court provided several factors to be considered when evaluating whether an employee established a causal link between a protected activity and an adverse employment decision, including temporal proximity between the protected activity and the adverse action; knowledge of the protected activity; expression of a negative attitude toward the employee's protected activity; failure to adhere to relevant established company policies; discriminatory treatment in comparison to similarly situated employees; and evidence the employer's stated reason for the employment decision is false. *See Alamo Heights*, 544 S.W.3d at 790.

–21–

In *Apache*, the supreme court stated it has repeated and utilized the factors for analyzing circumstantial evidence, but "we have never used them as a replacement for the *Hinds* standard. The factors may be more helpful in some cases and less in others. Some of the factors may actually be a distraction." *Apache Corp.*, 2021 WL 2603824, at *9.

Benavides worked for Macy's for more than six years; he was District Employee of the Year two years in a row and District Employee of the month numerous times. Before October 2015, Benavides had a positive, professional, and respectful relationship with Lillard. In October 2015, Benavides wrote the email letter on behalf of Alviar; Alviar used the email letter in his TWC hearing, which was attended by Lillard and Tidwell. After October 2015, Lillard's demeanor changed; Lillard became nonresponsive and unprofessional, he nearly stopped communicating with Benavides, and he avoided Benavides when they encountered one another in the store.

In his July 11 letter, Benavides stated that shortly after Lillard was advised of Benavides's statement on behalf of Alviar and Alviar prevailed with the TWC, "I started to experience difficulty with my schedule by Mr. Ibarra which I never had any difficulties with before." In the past, management accommodated his schedule changes with his primary employer. "However, after I provided my statement to the Texas Workforce Commission, management would no longer work with my schedule." Benavides explained how his scheduling concerns were treated

differently than those of other employees in the same department. Benavides was forced to move from a part-time position to a flex position, but continued to struggle to be assigned to work at Macy's when he was available. Macy's explained the scheduling problems as being a conflict between when Benavides was available and the company's business needs.

Benavides learned about Ibarra's Pursuit Policy violation in May 2016, and Benavides testified he promptly reported it to Lillard; Lillard then instructed him to record the CCTV footage and preserve evidence. Also in May 2016, Alviar filed his lawsuit against Macy's. The following month, Benavides was told he was being investigated for a sexual harassment claim, which Benavides denied and believed was fabricated. After investigating the allegation, Tidwell was unable to determine whether it was supported.

Benavides was named in Alviar's disclosures in September 2016. The last day Benavides worked for Macy's was September 13, 2016. In November 2016, he notified Bass that he continued experiencing hostility from Ibarra and complained Ibarra "refused to work with my schedule since speaking on behalf of a wrongful termination incident when my name was used without my knowledge on falsified company and state government documents by Mr. John Lillard."

On February 6, 2017, Benavides told Tidwell about the video of Ibarra violating the Pursuit Policy. The following day, Tidwell discussed Benavides's concerns with Lasker and, in that conversation, Tidwell told Lasker that Benavides

–23–

supported Alviar's suit against Macy's. At the time Tidwell spoke to Lasker, Tidwell knew that Benavides would be deposed in the Alviar litigation later in the month. On the same day, Lasker was contacted by Denise Sibrian, the asset protection department's training manager, and again discussed Benavides's support for Alviar.

In late February, Benavides was deposed in the Alviar lawsuit. Approximately two weeks later, he received the DML. Benavides and Macy's personnel had ongoing communications until Benavides was terminated on May 5, 2017.

Having reviewed the evidence in the record, we conclude the finder of fact could have concluded that Benavides's termination would not have occurred had he not participated in Alviar's proceedings against Macy's. Before beginning to help Alviar, Benavides had a stellar performance record and did not experience problems with his managers. However, shortly after Benavides began participating in Alviar's proceedings, Lillard's attitude toward Benavides changed, Benavides began having problems with his schedule, Benavides had to change from a part-time position to a flex position, Benavides was investigated for an alleged sexual harassment allegation that he considered groundless, Benavides was given a DML, and he was eventually terminated, purportedly for failing to report an incident he maintained he reported and for recording a video he claimed he was instructed to record. We conclude the trial court's Conclusion of Law 1 is factually supported, and the

evidence is legally and factually sufficient to show that but for Benavides's protected conduct, he would not have been terminated.

### 4. Conclusion

We conclude the evidence is legally and factually sufficient to support the trial court's retaliation finding. We overrule Macy's first issue.

## B. Damages

In its second through sixth issues, Macy's challenges the trial court's award of $35,000 to Benavides. The trial court's Conclusion of Law 3 states Benavides suffered damages for mental anguish, loss of enjoyment of life, and inconvenience in the amount of $25,000. Its Conclusion of Law 4 states Benavides suffered damages for lost earning capacity in the future in the amount of $10,000.

### 1. Mental Anguish, Loss of Enjoyment of Life, and Inconvenience

In its second through fifth issues, Macy's argues the evidence is legally and factually insufficient to support the trial court's award of damages for mental anguish, loss of enjoyment of life, and inconvenience. After the trial court issued its findings of fact and conclusions of law, Macy's requested additional findings and amended conclusions. Macy's asked that Conclusion of Law 3 "be amended to state what portion of the $25,000.00 is for: (i) past mental anguish; (ii) future mental anguish; (iii) past loss of enjoyment of life; (iv) future loss of enjoyment of life; (v) past inconvenience; and (vi) future inconvenience." Alternatively, Macy's requested the trial court "make the omitted finding(s) of fact that the Court contends support

–25–

initial Conclusion of Law No. 3." The trial court did not make any additional findings or amend its conclusions.

In response to Macy's second through fifth issues, Benavides argues Macy's waived any challenge to the sufficiency of the evidence supporting each damages element separately because Macy's did not specifically draw the trial court's attention to one or more elements in the trial court's broad form finding that was unsupported by the evidence. We agree.

"The supreme court has held that reversible error is presumed when a broad-form question submitted to the jury incorporates multiple theories of liability and one or more of those theories is invalid, *Crown Life Ins. Co. v. Casteel*, 22 S.W.3d 378, 388 (Tex. 2000), or when the broad-form question commingles damage elements that are unsupported by legally sufficient evidence, *Harris Cnty. v. Smith*, 96 S.W.3d 230, 233–34 (Tex. 2002)." *In re Marriage of C.A.S. & D.P.S.*, 405 S.W.3d 373, 394 (Tex. App.—Dallas 2013, no pet.) (citing *Thota v. Young*, 366 S.W.3d 678, 680 (Tex. 2012)). "[I]n order to preserve *Casteel*-type error in a bench trial, the party must request additional or amended findings of fact that specifically draw the trial court's attention to the complaint that one of the elements of damages included in the trial court's broad-form finding was unsupported by the evidence." *Id.* at 394-95 (citing *Tagle v. Galvan*, 155 S.W.3d 510, 516 (Tex. App.—San Antonio 2004, no pet.); *Miranda v. Byles*, 390 S.W.3d 543, 552 (Tex. App.—Houston [1st Dist.] 2012, pet. denied) (op. on reh'g) (to preserve error in bench trial,

–26–

party must request additional findings of fact and conclusions of law asking for detailed apportionment of findings between permissible and impermissible bases for liability)).

While Macy's contends the evidence is insufficient to support the trial court's $25,000 award and Macy's requested the trial court amend Conclusion of Law 3 or, alternatively, make additional findings of fact, Macy's did not "draw the trial court's attention to the complaint that one of the elements of damages included in the trial court's broad-form finding was unsupported by the evidence." *See Marriage of C.A.S. & D.P.S.*, 405 S.W.3d at 394. We conclude Macy's is limited to challenging the sufficiency of the evidence supporting the damages awarded as a whole. *See Donaldson v. J.D. Transp. Co., Inc.*, No. 04-04-00607-CV, 2005 WL 1458230, at *4 (Tex. App.—San Antonio June 22, 2005, no pet.) (mem. op.) (citing *Tagle*, 155 S.W.3d at 518). Accordingly, if the amount of damages awarded is supported by sufficient evidence of any element of damages requested, then we will uphold the award. *Id*. (citing *Tagle*, 155 S.W.3d at 518).

The process of awarding damages for amorphous, discretionary injuries such mental anguish, pain and suffering, and physical impairment is inherently difficult because the alleged injury is a subjective, unliquidated, nonpecuniary loss. *Cate v. Posey*, No. 05-17-01216-CV, 2018 WL 6322170, at *4 (Tex. App.—Dallas Dec. 4, 2018, no pet.) (mem. op.) (citing *Ten Hagen Excavating, Inc. v. Castro-Lopez*, 503 S.W.3d 463, 486 (Tex. App.—Dallas 2016, pet. denied)). The presence or absence

of pain, either physical or mental, is an inherently subjective question because the process is not readily susceptible to objective analysis. *Id.* The trier of fact is given discretion when determining such damages. *Id.*

Benavides testified the termination of his employment "impacted me greatly and deeply." He had many sleepless nights, which continued at the time of trial, and was stressed by the months-long complaint process that culminated with his termination. Being terminated "hindered [me] financially as well in the household. It's a lot of stress. Worry. Just concern." Benavides provided the only income in the household.

Benavides also worried about how the termination would impact his primary employment. In addition to working for Macy's, Benavides worked full time for a private security contactor, the Diamond Group. To work for the Diamond Group, he underwent periodic background checks by the Department of Homeland Security (DHS) and the Department of Justice; as part of those background checks, the agencies would inquire about his work history, including why employment with an employer ended. Benavides was concerned about reporting his termination because DHS would contact Macy's and ask various questions about "the reason why termination existed or the cause of termination and will assess findings and make their decision." He was concerned that, in the future, he would have problems with a DHS background check because he was terminated, and a background check with the Department of Transportation was "impeded" after he left Macy's.

Other evidence shows Benavides informed Macy's that his concerns about retaliation had "caused numerous inconvenience [sic] to me and added hardship which resulted in me obtaining part time employment elsewhere to supplement the income that I lost due to the actions of" Macy's personnel. He asked, perhaps rhetorically, in an email to Bass: "How much more inconvenience, setbacks, poor management, lack of integrity of management, retaliation and stress will I have to endure before all of this is over and [sic] be allowed to return to work?" He stated he was not financially compensated "for any of this for my times in meetings, hearings, travels etc! This has placed a huge burden and inconvenience in my personal life and primary employment as I have to cancel and rearrange my personal life and work schedule just to address Macy's issues."

The trial court judge, acting as the finder of fact, was free to consider and credit this evidence to show Benavides suffered inconvenience and mental anguish. Affording the appropriate deference to the trial court in considering this subjective loss, we conclude there is more than a scintilla of evidence to support the damages finding and the evidence supporting the award of compensatory damages was not so contrary to the overwhelming weight of the evidence as to be clearly wrong or unjust. Thus, we conclude the evidence is legally and factually sufficient to support the trial court's award of damages for mental anguish, loss of enjoyment of life, and inconvenience.

To the extent Macy's may have argued the award of $25,000 was not fair and reasonable, Macy's offers no reasoned analysis of why the award in this case is not fair and reasonable. Instead, Macy's merely reiterates its position that Benavides did not meet his burden to produce *any* evidence of mental anguish. The only inference we can draw from this argument is that Macy's contends that there should be no monetary award. *See Beamers Private Club v. Jackson*, No. 05-19-00698-CV, 2021 WL 1558738, at *12 (Tex. App.—Dallas Apr. 21, 2021, no pet.) (mem. op.). However, we have concluded the evidence is legally and factually sufficient to support the award.

We overrule Macy's second, third, fourth, and fifth issues.

### 2. *Award of Damages for Lost Future Earning Capacity*

In its sixth issue, Macy's argues the evidence is legally and factually insufficient to support the trial court's award of $10,000 in damages for lost future earning capacity because any relevant evidence is speculative and Benavides did not show his separation from Macy's diminished his future earning capacity. Benavides responds that his testimony shows the termination may affect his future employment.

"Lost earning capacity is an assessment of what the plaintiff's capacity to earn a livelihood actually was and the extent to which that capacity was impaired by the injury." *Big Bird Tree Services v. Gallegos*, 365 S.W.3d 173, 178 (Tex. App.—Dallas 2012, pet. denied). To support a claim for lost future earning capacity, the plaintiff must introduce evidence from which the trier of fact "may reasonably

–30–

measure in monetary terms his earning capacity prior to injury." *Bituminous Cas. Corp. v. Cleveland*, 223 S.W.3d 485, 491 (Tex. App.—Amarillo 2006, no pet.); *see also Virlar v. Puente*, 613 S.W.3d 652, 682 (Tex. App.—San Antonio 2020, pet. filed). "If the plaintiff's earning capacity is not totally destroyed, but only impaired, the extent of his loss can best be shown by comparing his actual earnings before and after his injury." *Bituminous*, 223 S.W.3d at 491; *see also W & T Offshore, Inc. v. Fredieu*, 610 S.W.3d 884, 899 (Tex. 2020), ("evidence of actual earnings at the time of trial is the best evidence of future earning capacity, but it is not the only evidence in an inquiry that looks many years or decades into a person's future."). Because the amount of money a plaintiff might earn in the future is always uncertain, the trier of fact has considerable discretion when determining this amount. *Bituminous*, 223 S.W.3d at 491; *see also Virlar*, 613 S.W.3d at 682-83.

At the time of trial, Benavides continued working for the Diamond Group and had a part-time job. Benavides testified that, since leaving Macy's, his earning capacity had not been diminished and he had not been denied any promotional opportunities or been demoted because of his separation with Macy's. He was not aware of future opportunities that would be jeopardized because of the termination. At the time of trial, Benavides earned more money than he earned when he worked for Macy's.

The record does not include evidence of Benavides's actual earnings before or after the termination, nor did Benavides provide any evidence that the termination

would adversely impact his future earning capacity. Having reviewed the record, we conclude there is not more than a scintilla of evidence supporting the damages award for lost future earning capacity. Accordingly, the evidence is legally insufficient to support the damages award for lost future earning capacity. *See Catalina*, 881 S.W.2d at 297. Because we conclude the evidence is legally insufficient to support the damages award for lost future earning capacity, we need not consider whether the evidence is factually sufficient. *See* TEX. R. APP. P. 47.1. We sustain Macy's sixth issue.

### C. Evidentiary Objection

In its seventh issue, Macy's argues the trial court abused its discretion by excluding John Lillard's statements made to Margie Tidwell during her investigation on the basis the statements were hearsay; Macy's asserts the excluded evidence probably resulted in an improper judgment.

Benavides testified Lillard instructed him to copy the CCTV footage "by any means necessary," including using his cell phone. Benavides also told Tidwell and Lasker that Lillard instructed him to copy the CCTV footage. Tidwell testified she investigated Benavides's allegations, including that Lillard instructed him to copy the CCTV footage. During Tidwell's testimony about her investigation and the decision to issue the DML, the following exchange took place:

> Q. Now, if Don [Benavides] took the video on his cell phone at John Lillard's direction, you wouldn't discipline him for that, correct?

–32–

> A. I would have to have heard that from Mr. Lillard, and when I spoke to Mr. Lillard, Mr. Lillard said that he did not approve that during the time that I did the investigation. Now - -
>
> Q. You don't have any notes of that, do you, that conversation with Mr. Lillard?
>
> A. No. I just had the conversation with Mr. Lillard along with - -
>
> [Counsel for Benavides]: I'm going to object as hearsay and nonresponsive.
>
> THE COURT: Sustained.
>
> [Counsel for Macy's]: Your Honor, it was part of her investigation, so it goes to state of mind in terms of disciplinary action.
>
> . . .

The topic was broached again when Macy's cross-examined Tidwell:

> Q. Did you investigate Mr. Benavides's allegation that he had notified Mr. Lillard of the policy violation?
>
> A. Yes, I did.
>
> Q. How did you do that?
>
> A. I called Mr. Lillard.
>
> Q. And was that investigation done in the course of determining whether a decision-making leave was warranted?
>
> A. Yes.
>
> Q. Did you talk to Mr. Lillard?
>
> A. I did.
>
> Q. What did Mr. Lillard tell you?
>
> [Counsel for Benavides]: Objection. Hearsay, Your Honor.
>
> [Counsel for Macy's]: It's not hearsay. Goes to state of mind. Absolutely not hearsay.

Counsel for Macy's argued the testimony was not offered for the truth of the matter asserted but to show the foundation for issuing the DML because the conversation with Lillard "goes to her state of mind in issuing the" DML. The trial court sustained the objection.

We review a trial court's decision to admit or exclude evidence for an abuse of discretion. *Fleming v. Wilson*, 610 S.W.3d 18, 21 (Tex. 2020). "To reverse a trial court's judgment based on the exclusion of evidence, we must find that the trial court did in fact commit error, and that the error was harmful." *Gunn v. McCoy*, 554 S.W.3d 645, 666 (Tex. 2018). Here, the trial court sustained hearsay objections. Hearsay is an out-of-court statement a party offers to prove the truth of the matter asserted. *See* TEX. R. EVID. 801(d). If a trial court abuses its discretion and erroneously excludes evidence, then we consider whether the error probably caused the rendition of an improper judgment. *JBS Carriers, Inc. v. Washington*, 564 S.W.3d 830, 836 (Tex. 2018); TEX. R. APP. P. 44.1. That standard does not require the complaining party "to prove that 'but for' the exclusion of evidence, a different judgment would necessarily have resulted." *JBS Carriers, Inc.*, 564 S.W.3d at 836 (quoting *State v. Cent. Expressway Sign Assocs.*, 302 S.W.3d 866, 870 (Tex. 2009)).

Exclusion is likely harmless if the evidence was cumulative or if the rest of the evidence was so one-sided that the error likely made no difference in the judgment. *Gunn v. McCoy*, 554 S.W.3d 645, 668 (Tex. 2018). However, exclusion of the evidence is likely harmful if it was "crucial to a key issue." *Id.* Even "if the exclusion of evidence is crucial to a key issue, it is "*likely* harmful," not conclusively or per se harmful." *Id.* (quoting *State v. Cent. Expressway Sign Assocs.*, 302 S.W.3d 866, 870 (Tex. 2009) (emphasis added)). When determining whether the exclusion of evidence was harmful, we review the entire record and apply the same standard—

–34–

whether the erroneous exclusion of evidence probably caused the rendition of an improper judgment—even when the excluded evidence related to a key issue. *Id.* at 668-69.

If we assume for purposes of this analysis that the trial court abused its discretion by sustaining the objections to Tidwell's testimony, we conclude the error probably did not cause the rendition of an improper judgment. Macy's asserts Tidwell's excluded testimony was offered to establish and explain Tidwell's state of mind and should have been admitted. The trial court heard Tidwell's testimony that "Mr. Lillard said that he did not approve" Benavides recording the footage on his cell phone. The trial court was aware that Tidwell knew Lillard and Benavides disagreed about whether Lillard instructed Benavides to record the CCTV footage at the time that Tidwell decided to proceed with the DML. Tidwell's admitted testimony clearly showed Lillard told her he did not give approval to Benavides to record the CCTV footage on his cell phone. Having reviewed the entire record in this case, we cannot conclude that any erroneous exclusion of Tidwell's testimony probably caused the rendition of an improper judgment because the excluded testimony was cumulative. Accordingly, Macy's has not shown the trial court's error, if any, was harmful. We overrule Macy's seventh issue.

## CONCLUSION

We reverse the trial court's award of $10,000 in damages for future lost earning capacity, and we render judgment that Benavides take nothing on his request

for damages for future lost earning capacity. In all other respects, we affirm the trial court's judgment.

191264f.p05

/Erin A. Nowell//
ERIN A. NOWELL
JUSTICE



## Court of Appeals
## Fifth District of Texas at Dallas

## JUDGMENT

MACY'S RETAIL HOLDINGS, INC., Appellant

No. 05-19-01264-CV     V.

AUDON BENAVIDES, Appellee

On Appeal from the 134th Judicial District Court, Dallas County, Texas Trial Court Cause No. DC-18-10796. Opinion delivered by Justice Nowell. Justices Osborne and Pedersen, III participating.

In accordance with this Court's opinion of this date, the judgment of the trial court is **AFFIRMED** in part and **REVERSED** in part. We **REVERSE** that portion of the trial court's judgment awarding $10,000 in damages for future lost earning capacity to Audon Benavides, and we **RENDER** judgment that Benavides take nothing on his request for damages for future lost earning capacity. In all other respects, the trial court's judgment is **AFFIRMED**.

It is **ORDERED** that each party bear its own costs of this appeal.

Judgment entered this 12th day of August, 2021.